TONY THORNTON AUCTION SERVICE, INC., d/b/a Tony Thornton Realty Co., a Missouri Corporation, and Tony Thornton, Plaintiffs–Appellants,

v.

Frances A. QUINTIS, Defendant–Respondent.

No. 15418.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 15, 1988.

Lewis Z. Bridges, Lake Ozark, for plaintiffs-appellants.

W. Gary Drover, Camdenton, for defendant-respondent.

FLANIGAN, Presiding Judge.

Plaintiff Tony Thornton Auction Service, Inc., a Missouri corporation ["the corporation"], brought this action for breach of contract against defendants Jacob J. Quintis and Frances A. Quintis, husband and wife. The defendants filed a counterclaim against the corporation for breach of contract. The counterclaim was also filed against an individual plaintiff, Tony Thornton. The legal file does not show when or in what manner Tony Thornton became a co-plaintiff. While the action was pending in the trial court, defendant Jacob Quintis died. No effort was made by either side to substitute his personal representative. Apparently all parties assumed, and still assume, that his death ended his interest in the litigation.

On May 10, 1984, the corporation entered into an "Auction Contract" with defendants. The contract provided that the defendants employed the corporation to conduct a "public auction sale." The property to be sold included defendants' 650–acre tract of improved land near Camdenton. Plaintiff Tony Thornton was the auctioneer who conducted the sale. He is also the president of the corporation and a licensed real estate broker.

Among the provisions of the auction contract were the following:

The corporation agreed to "advertise and conduct said public auction sale in a business-like manner." The sale was to be "with reserve." If the real estate failed to sell at the auction, the corporation was given the exclusive right to sell it for a period of 180 days following the date of the auction at a price of $1,250,000. In addition to certain advertising expenses, the corporation was to receive "a sum amounting to 6 percent of gross sale.... Monies due from the sale of real estate will be paid to [the corporation] at closing of the transaction." In the event of a breach of the contract by defendants, "[the defendants] shall pay [the corporation] the sum of $60,000 as liquidated damages."

The auction was held on June 15, 1984, but the real estate was not sold. The corporation's evidence showed that no bids were made on the real estate. Defendants' evidence showed that several bids were made and the highest bid was $975,000. Defendants' evidence further showed that when that bid was made, Tony Thornton, the auctioneer, recessed the bidding and did not permit the bidding to resume. The $975,000 bid was not "presented" by the auctioneer to the defendants for their consideration. On July 10, 1984, defendants notified the corporation that the contract was cancelled. On September 7, 1984, the defendants sold the land to one Dickerson for $925,000. This action ensued.

The petition alleged the making of the auction contract and incorporated its terms. It also alleged: Pursuant to the contract the auction was held on June 15, 1984, and the land failed to sell; "thereafter" [the corporation] produced a buyer ready, willing and able to purchase the real estate "at a price substantially in compliance with [the auction contract]"; "thereafter" defendants informed the corporation that they intended to terminate the auction contract and would refuse to pay any commission to the corporation upon the sale of the

real estate; the corporation performed all of the duties required of it under the auction contract and defendants breached their obligation.

The prayer of the petition was for the sum of $60,000 as liquidated damages, together with attorney's fees and costs.

Defendants' counterclaim against the corporation and Tony Thornton alleged the making of the auction contract. The counterclaim also alleged: Tony Thornton and the corporation had a confidential and fiduciary relationship with the defendants and breached their fiduciary duty by, among other things, conducting the auction in an improper manner; the highest bid at the auction was $975,000 and the corporation and Tony Thornton failed "to timely submit such bid to defendants and to reconvene the bidding"; as a result "such bid was lost without the knowledge and consent of the defendants"; if the bid had been submitted to defendants at the auction, defendants would have accepted it; on September 7, 1984, defendants sold the land for $925,000; as a result, defendants have been damaged in the amount of $50,000 [the difference between the bid of $975,000 and the subsequent sale price of $925,000], plus interest on $975,000 from June 15, 1984 [the date of the auction] through September 7, 1984 [the date of the sale of the real estate to Dickerson], plus interest on $50,000 from September 7, 1984, to date of judgment.

The prayer of the counterclaim was for actual damages in the sum of $69,713, plus interest on $50,000 from and after September 7, 1984, and punitive damages.

After a nonjury trial, the trial court, on August 21, 1987, entered a judgment finding the issues on the petition against the corporation and in favor of the defendant Frances A. Quintis. On the counterclaim the court found in favor of defendant Frances A. Quintis and against the corporation and Tony Thornton, jointly and severally, and awarded her actual damages in the sum of $76,272.55. The award consisted of the following items: $50,000 plus $13,-290.41 ["for interest at the rate of 9 percent per annum on the principal amount of $50,000 from September 7, 1984, to date of the judgment"]; plus $12,982.14 ["for interest at the rate of 9 percent per annum on the principal amount of $975,000 from June 15, 1984, through September 7, 1984"]. The corporation and Tony Thornton, co-plaintiffs, appeal.

In general, plaintiffs' points are that the trial court erred: (1) in finding against the corporation on the petition; (2) in finding in favor of defendant Frances A. Quintis and awarding her damages on the counterclaim because there was no proof that defendants were damaged by the corporation's alleged breach of the auction contract; and (3) in finding in favor of defendant Frances A. Quintis and against plaintiff Tony Thornton, individually, on the counterclaim, "in that all the evidence showed that Tony Thornton was acting as an agent for [the corporation] at all material times." For the reasons which follow, this court holds that point (1) has no merit, that point (2) is meritorious, and that the validity of point (2) makes it unnecessary to consider point (3).

Appellate review of this court-tried case is governed by Rule 73.01(c), V.A.M.R. This court must give due regard to the opportunity of the trial court to have judged the credibility of the witnesses. The judgment of the trial court will be sustained unless there is no substantial evidence to support it, or it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo.banc 1976).

Plaintiffs' first point is that the trial court erred in denying the corporation relief on the petition because the corporation "proved by uncontroverted evidence all facts necessary to establish the terms of the auction contract, its breach and consequent damages, and no defense was proved by defendants." The evidence which is material to the consideration of plaintiffs' first point must be viewed in light of familiar principles of the law of contracts.

■ "It is elementary that a party to a contract cannot claim its benefit where he is the first to violate it." *Boten v. Brecklein*, 452 S.W.2d 86, 92[2] (Mo.1970). To

similar effect see *S.G. Adams Printing v. Central Hardware Co.*, 572 S.W.2d 625, 629[8] (Mo.App.1978). "It is the general rule that, where one seeks recovery of damages of one who he alleges has violated the terms of a mutual contract, the plaintiff must allege and prove that he has himself performed or offered to perform [the] terms of the agreement." *Rosen v. Alside, Inc.*, 248 S.W.2d 638, 644[7] (Mo. 1952). To similar effect see *Brown v. McIbs, Inc.*, 722 S.W.2d 337, 344[11] (Mo. App.1986); *Stegemann v. Helbig*, 625 S.W. 2d 677, 679[1] (Mo.App.1981); *S.G. Adams Printing v. Central Hardware Co.*, supra, 572 S.W.2d at 629[6]. On the claim contained in the petition, the corporation had the burden of proof on the issue of fact of whether it had performed its obligations under the auction contract. *Brown v. McIbs, Inc.*, supra, 722 S.W.2d at 344[11].

The principal factual dispute was whether any bid to buy the real estate was made at the auction of June 15. Plaintiff Tony Thornton, Bill Kimmins, and Kurt Litsinger, all employees of the corporation, testified that no such bid was made. Kimmins, however, testified that he tape-recorded the auction. Defendants attempted to discover the contents of the recording but, as defendant Frances Quintis testified without contradiction, the recording "mysteriously disappeared."

The corporation "screened and qualified" all of the bidders and required each bidder to have a registration card as "proof of identification." Defendant Frances Quintis testified that bids to buy the real estate were made at the auction, including bids of $900,000, $925,000, $950,000, and $975,000. Other defense witnesses confirmed her testimony. Gary Fiene testified that he made the bid of $950,000 on behalf of Gary Acker, who was not present at the auction. Fiene also testified that after another person made a bid of $975,000 he, Fiene, asked for a recess in the bidding in order to telephone Acker. Tony Thornton, the auctioneer, declared a recess. Thornton never called for a resumption of the bidding.

Although Tony Thornton claimed that no bids were made on the real estate, he admitted that on his deposition he said, "If there was any legitimate bids, I got to be honest, I don't know." He also admitted that at his deposition he was asked this question: "Could there have been a bid for more than $900,000 that day?" and his answer was, "Well, I don't know.... If I had a bid of $900,000 I would have went and talked to them people [defendants]."

Defendant Frances Quintis testified that defendants "were thrilled with the $975,000 bid," and would have accepted it. She admitted, however, that if the bid had been accepted on June 15, 1984, the abstracts on the real estate were not "up-to-date" and it would take time to close the transaction and "get the money." This would have taken "30, 45, or 60 days."

She also testified that after Thornton had recessed the bidding, she approached him twice and asked him when the bidding would resume because she had heard "rumblings in the crowd." Thornton said to her, "I'll begin the bidding when the time is right." She said, "An hour later I approached him one more time and this time he was quite intimidating, he said he would start the bidding when the time was right." The bidding never resumed.

Thornton told her that it was Friday and the banks were closed. Thornton said, "By Monday [the bidders] will be able to reach their bankers and their backers and they will call me Monday morning." Mrs. Quintis said, "At that time I understood we still had a $975,000 bid. Thornton did not call me back Monday. I tried to reach him Tuesday and talked to his wife Betty. Betty said Thornton was very busy with auctions and was not at home and as soon as Thornton knew something definite he would let us know. I asked Betty for the names of the bidders and the amounts that they bid and she said Tony would handle that. That satisfied me for the moment. Thornton did not call me back as promised. We called three or four more times. We finally got Tony and he said, 'One of the bidders is still working on his backer. He bid $950,000. He is trying to get him to up it to $1,100,000.'"

On July 3, Thornton telephoned Mrs. Quintis. She described that conversation as the "big bang firecracker call." Thornton told her that he had a bid from a man from Kansas City for $650,000. She said, "Is that the down payment?" and Thornton said, "No, that's the total purchase price." She said, "You must be kidding." Thornton said, "I know it isn't much but I am obligated to present to you all the bids that I get." Mrs. Quintis testified: "I got a little bit angry.... I said, 'I understand you are to present all bids to me. I am still waiting for the bids you took at the auction. When are you going to present those to us?' and he said, 'We didn't take them at the auction and now they are lost. There are no bids.' That's the first thing I heard anything like that. We called our attorney Drover on July 5 and made an appointment to meet him two days later."

On July 10, 1984, defendants' attorney W. Gary Drover sent a letter to the corporation. The letter described the conduct of Thornton in recessing the bidding and in not submitting the highest bid to the defendants. The letter stated, "Your authority as agent for Mr. and Mrs. Quintis, if any, is hereby terminated and that contract is hereby cancelled."

■ The trial court was justified in not believing the evidence of the corporation that no bid on the real estate was made at the auction. Substantial evidence offered by defendants showed that the corporation breached its contractual duty to conduct the auction in a businesslike manner in that Tony Thornton, the auctioneer, received a bid of $975,000, did not present that bid to defendants for their consideration, recessed the bidding after that bid had been made, and refused to reopen the bidding thereafter. The trial court was justified in believing defendants' evidence. The record supports the findings that the corporation, through Tony Thornton, was the first party to violate the auction contract and failed to perform its obligations under the auction contract. Plaintiffs' first point has no merit.

■ Plaintiffs' second point is that the trial court erred in awarding damages to defendant Frances A. Quintis on the counterclaim because she [and her husband] failed to prove that they were damaged by reason of the corporation's breach of the auction contract. In support of their second point, plaintiffs make this argument: Defendants sold the real estate on September 7, 1984, for $925,000 and paid no commission to anyone on that sale. If the $975,000 bid had been accepted by defendants on June 15, 1984, at the auction sale, the corporation would have received a commission of 6 percent of $975,000, or $58,-500, and the net amount received by the defendants would have been $916,500. Since, by the subsequent sale, defendants received $925,000 on September 7, 1984, they sustained no damages. For the reasons which follow, this court agrees with that argument.

"The general principle of awarding damages where there has been a breach of contract is that the person damaged is, as far as possible to do so by a monetary award, to be placed in the position he would have been had the contract been performed. He is entitled to recover the value of the contract at the time of its breach or the value of the promised performance, or the value of the benefit contracted for. *Boten v. Brecklein*, Mo. Sup., 452 S.W.2d 86[4–8]."

*Dunning v. Alfred H. Mayer Company*, 483 S.W.2d 423, 427[3, 4] (Mo.App.1972).

The law, however, will not place defendant Frances A. Quintis, with respect to her counterclaim, in a better position than she would have been if the contract had been completed on both sides. *Boten v. Brecklein*, supra, 452 S.W.2d at 93[8]; *Swiss–American Importing Co. v. Variety Food Prod. Co.*, 471 S.W.2d 688, 690[2] (Mo.App. 1971); 25 C.J.S. Damages, § 74, p. 849. Mrs. Quintis is entitled to the benefit of her bargain, that is whatever *net* gain she would have made under the auction contract. *Boten*, supra, at 93; *ArtCraft Cabinet, Inc. v. Watajo, Inc.*, 540 S.W.2d 918, 924[6, 7] (Mo.App.1976). See Williston on Contracts, § 1338; Restatement of Contracts, 2nd, § 347.

"Any benefit to the plaintiff resulting from a breach of contract reduces the damages otherwise payable. For instance, anything of value which complainant retains because of the breach but which was to have been delivered to the defendant had the contract been performed must be deducted from complainant's gross recovery. This includes not only the money the plaintiff saved by not performing the contract, but also what that money could have earned."

22 Am.Jur.2d Damages, § 552, p. 630. To similar effect see Corbin on Contracts, Vol. 5, § 1038, pp. 236–237; McCormick on Damages, § 143, p. 587.

If the contract had been fully performed by both sides with respect to the bid of $975,000, the corporation would have been entitled to a commission of $58,500. At most, the net proceeds payable to Mrs. Quintis and her husband would have been $916,500. The fact is that they would have incurred other expenses, such as advertising, which would have reduced their realization of $916,500 to a somewhat lower figure.

Mrs. Quintis testified, with commendable candor, that bringing the abstracts up-to-date would postpone the closing of the transaction based on the $975,000 bid so that she and her husband would not have realized their share of the sale proceeds until, possibly, August 15, 1984. The fact is that on September 7, 1984, by reason of the subsequent sale to Dickerson, they realized a benefit of $925,000. Even if they had received $916,500 on August 15, 1984, by reason of full performance of the auction contract, that sum, invested at the legal rate, would fall short of amounting to $925,000 on September 7, 1984.

Under the foregoing authorities Mrs. Quintis was not entitled to recover on her counterclaim because she [and her husband] had sustained no damage by reason of the corporation's breach of the auction contract. Plaintiffs' second point is meritorious and the award on the counterclaim must be set aside. It is, therefore, unnecessary to consider plaintiffs' third point.

That portion of the judgment which awarded defendant Frances A. Quintis the sum of $76,272.55 on her counterclaim against the corporation and Tony Thornton, jointly and severally, is hereby reversed. In all other respects the judgment is affirmed.

HOGAN, MAUS and PREWITT, JJ., concur.